# In re Petition of Hilton

*Ronald E. Reitz,* appearance limited to preparation and presentation of petition.

*Brie Hilton,* pro se.

FORNELLI, *P.J.,* October 24, 2005—The matter before the court for disposition is a petition to transfer structured settlement payment rights filed by Brie Hilton (petitioner).

Petitioner is a 22-year-old woman with two dependents, Taylor Mikio, age 5, and Dani Mikio, a newborn. (Petition to transfer structured settlement payment rights at exhibit "C".) Petitioner is unemployed, but she has no mental or physical limitations that would prevent her from working. *Id.* Moreover, she is actively seeking employment and confident that she will obtain employment quickly. *Id.*

Petitioner is also the recipient of certain lump-sum payments as a result of the settlement of a personal injury claim. (Petition ¶3.) She is to receive $20,000 on May 10, 2008; $30,000 on May 10, 2013; $35,000 on May 10, 2018; and $100,000 on May 10, 2023. (Petition ¶3.) She is seeking court approval to assign the lump-sum payment of $20,000 due to her on May 10, 2008, to Settlement Funding L.L.C. in exchange for an immediate cash payment of $9,285. (Petition ¶¶5-9.)

Petitioner initially intended to use approximately $7,000 of this amount as a down payment on a mobile home; approximately $600 for three months worth of lot

rental; $600 to purchase baby supplies; and approximately $1,000 to bring her electric, phone and cable bills current. (Petition at exhibit "C".) She "believe[s] this transaction is in [her] best interest and the best interest of [her] dependents." *Id.*

On October 19, 2005, a hearing was held on this petition. At that time, petitioner testified that her intentions had changed. She testified that an uncle of her fiancé either had loaned, or intended to loan her (her testimony was not clear in this respect), $24,000 towards the purchase of a home located at 162 3rd Avenue, Sharon, Pennsylvania. She now intends to give $5,000 of the lump-sum payment to her fiancé's uncle, she testified first, that this would be a down payment, and later that this amount would be applied to the principal amount, as her fiancé had previously contributed $1,300 as a down payment; $1,000 would be given to her father to "set aside" for her daughters; and the remaining amount would be used to pay off various unspecified bills.

Petitioner also testified that she has previous criminal convictions for simple assault and violation of her probation. She admitted to a history of drug use and stated that her past criminal troubles were drug and alcohol related. She further indicated that she has not worked since 2003 as a result of transportation and family problems. As of the hearing date she remained unemployed, but she indicated that she was still actively seeking employment, and recently had an interview at the Hickory Grill in Sharon, Pennsylvania.

When a person receives an award as a result of a personal injury claim, various payment options exist. For example, she may receive the entire award in a lump sum,

or she may elect to receive a portion of the settlement in a series of periodic payments. If an injured person receives a lump-sum settlement and she knows that it is meant to provide for her future needs, she would likely invest it in some manner. Structured settlement agreements serve the same purpose, but instead of investing the money after the settlement, the award and investment are incorporated into the settlement agreement itself, taking into consideration a person's expected future needs and tailoring the payments accordingly. See generally, Paul J. Lesti, *Structured Settlements* §19:9.

Structured settlements also serve an important public policy purpose. *Id.* If an injured person's award is not properly invested, or if it is wasted, a person may have to turn to state or federal assistance for their care. *Id.* By structuring the payments over time, the risk that the care of this individual will fall upon society is decreased.

However, after entering into a structured settlement agreement, a party's circumstances may change, and they may not wish to wait to receive their next payment. They will try to assign, or in effect, sell, their right to a future payment in exchange for immediate cash. A secondary market for structured settlements exists for this exact purpose. There are businesses that will, for a premium, offer instant cash in exchange for an injured person's future payment. These businesses, such as Settlement Funding,[1] are known as factoring companies.

1. Settlement Funding is also referred to in the pleadings as "Peachtree Finance Company L.L.C." (Petition at exhibit "B" ¶H); "Peachtree Settlement Funding L.L.C." (Petition at exhibit "C"); and simply "Peachtree." (Petition at exhibit "C".)

382

In order to ensure that an injured person will not be taken advantage of by a factoring company, the General Assembly enacted the Pennsylvania Structured Settlement Protection Act, 40 P.S. §§4001-4009.[2] When the recipient of structured settlement payments wishes to assign a future payment to a third party, she must file a petition with the court. 40 P.S. §4003. This petition must include a disclosure statement submitted by the proposed recipient of the assignment that sets forth all relevant elements of the transaction. *Id.* The purpose of the disclosure statement is to provide the petitioner with sufficient information as to the consequences of the proposed assignment to allow her to make an informed decision whether to assign a future payment.

In addition to the disclosure requirements imposed upon the proposed recipient of a future payment, *i.e.,* the factoring company, the Act also imposes a quasi-guardianship role upon the court. The court must determine that the proposed transaction is in the best interest of the petitioner and her dependents. 40 P.S. §4003(a)(3). This provision admits the reality that a person's judgment is often clouded by the lure of quick cash; and insures that

2. There is a strong incentive for factoring companies to comply with the Structured Settlement Protection Act. The Internal Revenue Service imposes a tax equal to 40 percent of the factoring discount on any person who acquires the right to receive a structured settlement payment. 26 U.S.C. §5891(a). However, this tax does not apply if the transaction is approved in advance under the authority of an applicable state statute by a state court. 26 U.S.C. §5981(b)(2)(B)(ii). To avoid the possibility of incurring a 40 percent tax, Settlement Funding specifically required court approval as a condition precedent to any obligation on its part. (Petition at exhibit "B" ¶D.2.)

the public policy considerations involving structured settlements are not usurped by organizations that lure people into assigning future payments for far less than their actual value.

Prior to addressing whether this transfer is in petitioner's best interest, the court will first address two issues with the disclosure statement. First, the Act requires that all legal fees and processing fees be "itemized." 40 P.S. §4003(a)(2)(v). The term "itemized" is not specifically defined in the Act, nor has it acquired an unusual or technical meaning. The Statutory Construction Act provides that words and phrases shall be construed according to rules of grammar and according to their common and approved usage. 1 Pa.C.S. §1903. The word "itemized" means simply "to list in detail; to set forth by item." 7 Black's Law Dictionary 837.

Here, the legal fees and processing fees are not properly itemized as required by the Act. See *e.g.,* 40 P.S. §4003(a)(2)(v). The disclosure statement merely recites "Legal fees" of $2,000 and "Processing fees" of $200. (Petition at exhibit "D".) The disclosure statement does not denote the amount of hours worked on the petitioner, the rate per hour, the expenses claimed to be "Processing fees" nor does it otherwise provide petitioner with any meaningful basis to evaluate the reasonableness of these fees.[3]

---

3. The court notes that in a fairly recent case in the Superior Court of Connecticut, Settlement Funding L.L.C. also attempted to charge a $2,000 legal fee and $200 processing fee without properly itemizing these expenses. *Davis v. Travelers Casualty and Surety Company,* no. CV20815609, 2002 WL 1818733 (Conn. Super. 2002).

With respect to the term "Processing fees," the term itself is far too general to be satisfied by merely stating an amount without any supporting information. It is impossible to determine, based on the mere recitation of an amount, exactly what type of "processing" went into this petition, and also whether this "processing" was truly worth $200.

Next, the discount rate used in the disclosure statement appears to be out of date. The disclosure statement must include the discount rate used in determining the discounted present value of the payments. 40 P.S. §4003(a)(2)(iii). The discounted value of the future payment is the amount the person would need to invest today, at the current interest rate, in order to have the future amount available at the future date. For example, at the current discount rate of 5.0 percent (IRS Rev.Rul. 2005-57 table 5), a person would need to invest $78.35 to have $100 in five years.

The discounted present value of future payments is to be determined by discounting such payments to the present using the *most recently published* applicable federal rate for determining the present value of an annuity, as issued by the United States Internal Revenue Service. 40 P.S. §4002. (emphasis added)

On the date this petition was filed, September 2, 2005, the applicable federal rate for determining the present value of an annuity was 5.0 percent. IRS Rev.Rul. 2005-57 table 5. The petition incorrectly uses the discount rate as of May 11, 2005, 5.20 percent. (Petition ¶9c); see also, IRS Rev.Rul. 2005-27. As of the date the petition was filed, the most recently published rate was 5.0 percent,

not 5.20 percent. The present value of petitioner's $20,000 future payment, based on a 5.0 percent discount rate over a 30-month period,[4] is $17,711.28, or $517.54 more than the amount listed in the disclosure statement. See petition at exhibit "D".

Petitioner should know the most recent, accurate, present value of her lump-sum payment, calculated with the most recent available discount value, in order to truly make an informed decision whether to assign this payment.

Although the errors in the disclosure statement may be corrected, a proper itemized listing of all fees and a correct present value calculation will not cure the overwhelmingly one-sided nature of this proposed assignment. This transaction represents exactly the type of abuse the Act was designed to prevent. In exchange for assigning to Settlement Funding her $20,000 payment on May 10, 2008, petitioner will receive $9,285 in immediate cash. In essence, Settlement Funding is loaning her money at between 33 percent and 36 percent annually, depending upon when Ms. Hilton receives the payment.[5]

---

4. A 30-month period was used as an estimate based on the length of time between the date of this order and any possible disbursement of funds.

5. This interest rate was calculated using the formula:

$i = (FV/PV)\text{-}t.$ [$i$ = interest rate, FV = Future Value, PV = Present Value $t$ = Time.] (www.netmba.com/finance/time-value/future).

The rate of interest depends upon how soon petitioner would receive the money. She would likely receive the cash payment approximately 2.67-2.5 years prior to the due date for her next lump sum payment. At 2.5 years her interest rate is approximately 36 percent; at 2.67 years, her interest rate is 33 percent. Pennsylvania has no civil usury statute, nor does the current Pennsylvania Crimes Code, 18

(The cash amount includes fees; Peachtree Funding is actually paying her $11,485, but deducting $2,000 for legal fees and $200 for processing fees.)

Obviously, to induce anyone to loan them money a person will have a pay interest. Interest is the cost of credit. The interest rate will necessarily correlate to the credit-worthiness of the borrower, *i.e.,* a high-risk borrower will have to pay a greater rate of interest than a low-risk borrower. No information is available about petitioner's credit-worthiness or credit rating, nor is any necessary in this case. This proposed transaction is actually a secured loan. Barring some type of catastrophe, there is no risk that Settlement Funding will not receive the $20,000 payment on May 10, 2008 from Transamerica Annuity Service Corporation, the structured settlement obligor. It is doubtful that many lenders will require a 33-36 percent interest rate on a secured loan.

Although petitioner's desire for immediate cash in light of the recent birth of her child is certainly understandable, she has not set forth any basis for the court to conclude that entering into this specific transaction, which essentially allows her to incur a secured debt at an interest rate in excess of 33 percent per year, is in her best interest. Moreover, she testified that she intended to give her father $1,000 of this money to "set aside" for her

Pa.C.S. §101 et seq., define the crime of usury. The prior Penal Code defined "criminal usury" as charging, taking or receiving any money, things in action or other property as interest on the loan at an annual interest rate exceeding 36 percent. 18 P.S. §4806.1(h). This section may continue to be in force in view of 1 Pa.C.S. §1952, relating to disposition of amendments of existing statutes incorporated into and repealed by a code at the same general assembly. 18 P.S. §4806.1 *2000 Main Volume Historical and Statutory Notes.*

daughters' future needs. She stated that $500 for each child would be placed into some type of interest bearing account. Petitioner was unsure of exactly the type of account, but she was certain it would be an interest bearing account, possibly a certificate of deposit.

If petitioner were to invest $1,000 as of the hearing date, October 19, 2005, in a two and one-half year certificate of deposit, representing the approximate time between the hearing date and the date she will receive her next lump sum payment, at the highest interest rate available locally of 4.55 percent,[6] this $1,000 investment would be worth $1,122.23 on May 20, 2008. At the current discount rate of 5.0 percent, $1,000 of the present value of her next structured settlement payment would be worth $1,134.82 on May 20, 2008. It would not be in the best interests of petitioner, nor her children, to take out a secured loan and pay over 30 percent interest, in order to invest money at less than five percent interest. When the cost of this proposed transaction is combined with even the highest locally available interest rate, the net rate earned on this proposed investment would be approximately -25 percent to -30 percent. Petitioner and her children would be far better off if she left the structured settlement untouched.

What is specifically troubling about this petition is that petitioner is acting without the assistance of counsel. Petitioner has clearly been made aware that she has a

---

6. As of October 19, 2005, the highest available local interest rate for a 2.5 year CD in the Sharon, Pennsylvania market was 4.55 percent through ING Direct. See Comparison Table of Institution Rates for 2.5 year CD in Sharon PA, available at www.bankrate.com.

right to counsel, and she has waived that right. (Petition at exhibit "E".) It is also clear that Swartz Campbell L.L.C. has been retained solely to prepare and present this petition and has provided petitioner with no professional advice with respect to the advisability or implications of the proposed transfer. (Petition ¶20.) But, it is doubtful that petitioner truly understands the consequences of her waiver or her need for professional advice when entering into a complex transaction of this nature.

The Pennsylvania Legislature specifically provided for the court to determine whether this transaction is in her best interests. However, the court cannot advise petitioner, nor assist her in negotiating for and obtaining an assignment that would actually be in her best interest.

As previously noted, this disclosure statement indicated that petitioner will incur legal fees of $2,000, and yet she will remain unrepresented and uncounseled. Petitioner, in lieu of paying $2,000 in legal fees for the mere preparation and presentation of a petition, would be far better off hiring an attorney or a financial advisor who could explain to her the true consequences of assigning this or any future lump sum payments; and assist her in negotiating for and obtaining an immediate payment that better reflects the present value of her next payment. If petitioner intends to use a portion of any of the immediate cash proceeds from assigning a future payment to pay legal fees, she should pay these fees to someone willing to provide her with the full benefits of legal representation, including independent advice and counsel regarding the advisability of the proposed transaction.

It is clear that petitioner's circumstances recently changed, specifically due to the recent birth of her new child. Furthermore, there is little doubt that any single mother with two young children, such as petitioner, could use additional immediate cash. But petitioner stresses that she does not need this money to meet her daily needs and expenses. (Petition at exhibit "C".) She also testified that her fiancé was providing support for her and the two children. Petitioner has no current needs so dire and urgent that she should be forced to turn over to Settlement Funding 54 percent of the present value of her next lump sum payment.

Simply put, on May 10, 2008, approximately 32 months from this date, petitioner and her two children will need the additional $11,485 far more than Settlement Funding.

An appropriate order of court will follow.

## ORDER

And now, October 24, 2005, the petition of Brie Hilton to transfer structured settlement payment rights is denied for the reasons set forth in the accompanying opinion.